# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Norfolk Division

**UNITED STATES OF AMERICA**

v.  Criminal Action No. 2:11cr33

**MOHAMMAD SAAILI SHIBIN**
a/k/a "Khalif Ahmed Shibin"
a/k/a" Shibin"

**Defendant.**

## OPINION AND ORDER

This matter is before the Court upon Defendant Mohammad Saaili Shibin's ("Defendant") Motion to Suppress, filed July 26, 2011. The motion has been fully briefed, the Court has heard oral argument, and the matter is now ripe for decision. For the reasons stated herein, Defendant's motion is hereby **DENIED**.

### I. FACTUAL AND PROCEDURAL HISTORY[1]

This case arises out of the seizures of two ships, the M/V Marida Marguerite and the Quest, off of the coast of Somalia. The United States alleges that in May 2010, several Somali nationals, not including Defendant, attacked and seized the M/V Marida Marguerite, a German-owned vessel with a crew of 19 Indians, two Bangladeshis, and one Ukrainian. Thereafter, the crew steered the ship to an area just off the coast of Somalia, at which time Defendant allegedly came to the Marida Marguerite and began to serve as a translator and negotiator during ransom

---

[1] The facts recited here are drawn from the allegations set forth in the Superseding Indictment. The facts are assumed true only for the purpose of deciding the motion currently before the Court. The facts recited here are not factual findings for any purpose other than for the consideration of the instant motion.

negotiations. According to the government, through Defendant's assistance, the pirates extracted a substantial ransom payment in exchange for the return of the twenty-two hostages taken. Defendant reportedly received approximately $30,000 as his share of the ransom payment.

The United States further alleges that on February 18, 2011, several armed Somali nationals, not including Defendant, boarded the Quest, a United States flagged vessel, took the four United States citizens on board as hostages, and steered a course for Somalia. At this time, United States Military personnel aboard the USS Sterett, located off the coast of Somalia, attempted to secure the release of the hostages through negotiations with several of the hostage-takers. On February 20, 2011, one of the hostage-takers aboard the Quest purportedly identified Defendant as the person responsible for negotiating the return of the hostages upon the vessel's arrival in Somalia. On February 22, 2011 one of the individuals on board the Quest fired a rocket propelled grenade at the USS Sterett and at least three of the Somali nationals aboard the Quest shot and killed the hostages before they could be rescued by the U.S. military.

On March 8, 2011, a federal grand jury returned a three-count Indictment against Defendant. Docket No. 3. On August 17, 2011, a federal grand jury returned a Superseding Indictment charging Defendant with fifteen counts. Docket No. 34. With respect to the seizure of the Marida Marguerite, Defendant faces six charges. Count One alleges Piracy under the Law of Nations, in violation of 18 U.S.C. §§ 1651, 3238 and 2; Count Two charges Defendant with Conspiracy to Commit Hostage Taking, in violation of 18 U.S.C. § 1203(a); Count Three charges Defendant with Hostage Taking, in violation of 18 U.S.C. §§ 1203(a), 3238 and 2; Count Four alleges Conspiracy to Commit Violence Against Maritime Navigation, in violation of 18 U.S.C. § 2280(a)(1)(A); Count Five alleges Violence against Maritime Navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(A), 2280(b)(1), 3238 and 2; and Count Six charges Defendant with

Using, Carrying, and Discharging a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 3238 and 2.

For his participation in the seizure of the Quest, Defendant faces nine additional charges. Count Seven charges Defendant with Piracy under the Law of Nations, in violation of 18 U.S.C. 1651; Count Eight charges Defendant with Conspiracy to Commit Hostage Taking, in violation of 18 U.S.C. §§ 1203(a) and 3238; Count Nine charges Defendant with Hostage Taking, in violation of 18 U.S.C. §§ 1203(a), 3238 and 2; Count Ten charges Defendant with Conspiracy to Commit Kidnapping, in violation of 18 U.S.C. §§ 1201(c) and 3238; Count Eleven charges Defendant with Kidnapping, in violation of 18 U.S.C. §§ 1201(a)(2), 3238, and 2; Count Twelve charges Defendant with Conspiracy to Commit Violence Against Maritime Navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(H), 2280(b)(1) and 3238; Count Thirteen charges Defendant with Violence against Maritime Navigation, in violation of 18 U.S.C. §§ 2280(a)(1)(A), 2280(b)(1), 3238 and 2; Count Fourteen charges Defendant with Using, Carrying, and Brandishing a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and (B)(ii), 3238 and 2; and Count Fifteen charges Defendant with Using, Carrying, and Discharging a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii), 3238 and 2.

On April 4, 2011, Defendant was taken into custody by foreign forces in Bosasso, Puntland, Somalia, in coordination with the United States Government's efforts to locate Defendant. Hr'g Tr. 19. While Defendant was in the custody of host nation forces, FBI Special Agent Brian Maliszewski visited Defendant and provided him with the FBI's "advice of rights" form, which contained standard *Miranda* warnings. Hr'g Tr. 6-7, Jan. 19, 2012. The Defendant read the entire form aloud in English, indicated that he understood the warnings, and signed the

waiver of rights. Hr'g Tr. 7-8. During the ensuing interview, Defendant indicated that he spoke English and did not need a translator. Hr'g Tr. 8-9. On April 5, 2011, Defendant remained in the custody of foreign forces, and approximately 9 hours after the conclusion of the prior day's questioning, he was again interviewed by FBI agents, including Agent Maliszewski. Hr'g Tr. 10. Prior to this second interview, the agents reviewed with Defendant the advice of rights form which he had previously executed and obtained his signature on a new waiver form. Hr'g Tr. 10. During this interview, Defendant consented to a search of his luggage and other personal effects. Hr'g Tr. 11.

On April 6, 2011, while still in foreign custody, and approximately 24 hours after the second interview concluded, the FBI agents again interviewed Defendant. Hr'g Tr. 11. Prior to this interrogation, the agents reviewed the advice of rights form with Defendant, and Defendant executed a written waiver and consented to further questioning. Hr'g Tr. 11. Each time that the agents asked Defendant whether he was being treated well, Defendant answered in the affirmative. Hr'g Tr. 9-11.

During the third round of questioning, Defendant admitted that he had previously served as a translator for pirates and that he had operated as a pirate negotiator during the hijacking of a German vessel named the M/V Marida Marguerite. Hr'g Tr. 13. Defendant stated that he had been directly contacted by pirates who requested that he served as a translator, and that he earned $30,000 for his participation in the hijacking of the Marida Marguerite. Hr'g Tr. 13-14. With respect to the hijacking of the S/V Quest, Defendant was shown a picture of a cell phone and photographs of "screen shots" taken from that phone.[2] The screen shots showed several internet searches conducted through the phone which included "Hijacked S/V Quest by somali pirates,"

---

[2] A "screen shot" is a photograph of the display screen of the cell phone. The display screen may display such things as prior incoming and outgoing phone calls and internet searches conducted using the phone.

"Jean and Scott Adams telephone number," "address of hijacked S/V Quest owner," "jean and scott adams profile," and "Hijacked S/V Quest value." Hr'g Tr. 15, 17. After reviewing these images, Defendant admitted that the screen shots were from his phone and that he had searched the topics noted above using the phone. Hr'g Tr. 15-17. Defendant also described what he called an "auto alert" feature on his phone which would send him updates whenever vessels had been hijacked off of the Somali coast. Hr'g Tr. 16. Defendant claimed that he had researched these topics and activated these auto alerts solely out of personal curiosity, and that he did not agree to help the pirates with their hijacking of the Quest. Hr'g Tr. 16-17.

On April 6, 2011, Defendant was taken into FBI custody pursuant to an arrest warrant issued in this District. Hr'g Tr. 17. At this time, the arresting agents reviewed the charges with Defendant and transported Defendant to the USS Boxer, a Navy vessel located off of the coast of Djibouti. Hr'g Tr. 17-18. After Agent Maliszewski again reviewed the charges pending against Defendant on April 7, 2011, Defendant stated that he did not want to provide any more information and that he thought he needed professional help. Hr'g Tr. 18, 26-27. When asked to clarify what he meant, Defendant stated that he thought he needed a lawyer. Agent Maliszewski treated this statement as an invocation of the right to counsel and thus ceased all questioning of Defendant. Hr'g Tr. 18.

Later on April 7, 2011, Defendant was taken on board a Department of Justice-owned aircraft for the purpose of transporting Defendant to the United States. Hr'g Tr. 29-30. On board the aircraft were several law enforcement officers, including FBI Special Agent Kevin Coughlin. Hr'g Tr. 32. Prior to the time that the flight departed Djibouti, Agent Maliszewski debriefed Agent Coughlin regarding the interviews he had previously conducted of Defendant and informed Agent Coughlin that Defendant had ultimately invoked his right to counsel. Hr'g

Tr. 30. The plane departed for the United States at approximately 2:55 p.m. on April 7, 2011. Hr'g Tr. 33. Agent Coughlin testified that, at the outset of the flight, Defendant was provided a meal and was examined by medical personnel. Hr'g Tr. 34. Agent Coughlin further testified that neither he nor any other agent on board the aircraft attempted to engage Defendant in conversation about the hijacking of the Marida Marguerite or the Quest, nor did they discuss these incidents in Defendant's presence. Hr'g Tr. 34-35.

However, according to Agent Coughlin's testimony, after some time had passed on the flight, Defendant allegedly began asking the agents questions about his case. Hr'g Tr. 35. Agent Coughlin testified that he advised Defendant that he could not discuss the case with Defendant because Defendant had requested an attorney. Hr'g Tr. 36. This pattern apparently continued for a number of hours, with Defendant attempting to engage the agents in conversation about his case and the agents responding that they could not discuss it with Defendant. Hr'g Tr. 36. After this back and forth between Defendant and the agents on board occurred for approximately the third time, Agent Coughlin informed Defendant that the only way they could discuss the case was if Defendant indicated that he had changed his mind and no longer wanted an attorney. Defendant replied that he wanted to answer questions without an attorney present. Hr'g Tr. 36. At this time, Defendant reviewed and signed an advice of rights waiver. Hr'g Tr. 37-39.

During the ensuing interview, Defendant admitted that he was involved with the hijacking of the Marida Marguerite. Hr'g Tr. 41. Specifically, Defendant stated that he was brought on as the negotiator and translator for the hijacking and that he was paid $30,000 in U.S. currency for his role in that incident. Hr'g Tr. 41. Defendant also indicated that he had been approached by someone requesting that he serve as the negotiator and translator for pirates during the hijacking of the Quest. Hr'g Tr. 40. Defendant admitted to knowing one of the

pirates aboard the Quest and stated that he had used Google to look up the ship to find out the name of the owner of the Quest, how much the vessel was worth, and how to contact the owner. Hr'g Tr. 40. Defendant was not handcuffed during the questioning by the agents. Hr'g Tr. 48.

After approximately one hour of questioning, Defendant indicated that he wanted to take a break. Hr'g Tr. 40-41. Defendant was provided coffee and underwent another medical check. Hr'g Tr. 41. Approximately four hours later, Agent Coughlin re-initiated questioning. Defendant was again informed of his *Miranda* rights and again signed an advice of rights waiver. Hr.'g Tr. 41-42. However, after approximately twenty minutes of questioning, Defendant stated that he had a headache and did not want to continue. Hr'g Tr. 43. The agents attempted to re-engage Defendant a number of times, however, each time, Defendant responded that he was tired or had a headache and did not want to discuss the case any further. Hr'g Tr. 43-44. No further questioning occurred during the remainder of the flight. Hr'g Tr. 44.

## II. LEGAL STANDARD

Motions to suppress are mixed questions of law and fact that are properly disposed of by the court without assistance of a jury. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005); Fed. R. Crim. P. 12(b)(3)(C), 12(d); Fed. R. Evid. 104(a). Where, as here, a motion to suppress concerns statements made by a defendant, the protections conferred by the Fifth Amendment control. The Fifth Amendment provides, in pertinent part, "[n]o person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection applies not only to courtroom proceedings, but also to out-of-court, custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). It is uncontested that the interviews during which Defendant made the statements in question qualify as "custodial interrogations." Thus, the teachings of *Miranda* and its progeny govern this court's inquiry.

Under *Miranda*, statements made during custodial interrogations are admissible only if a defendant is first warned that he has the right to remain silent, that anything he says can and will be used against him, that he has a right to an attorney, and that if he cannot afford an attorney, one will be provided to him. *Id.* at 444. If, after receiving these warnings, a defendant invokes his right to counsel, all interrogation must cease until that defendant is given an opportunity to confer with an attorney and to have that attorney present during any future questioning. *Id.* at 473-74. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court fortified this procedural framework, holding that when an accused has invoked his right to counsel, a valid waiver of that right cannot be established by showing only that the accused responded to further police-initiated custodial interrogation. *Id.* at 484.

However, the robust protections announced in *Edwards* do not preclude the introduction of statements made by an accused who has invoked the right to counsel so long as the accused *himself* initiates the further communication, exchanges, or conversations with the police. *See id.*, at 484-85; *Minnick v. Mississippi*, 498 U.S. 146, 156 (1990) ("*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities"). Thus, the question of whether Defendant's statements were taken in violation of his Fifth Amendment rights turns on two inquiries: first, whether Defendant actually invoked his right to counsel; and second, a determination of "who initiated the further discussions that yielded the eventual statement." *United States v. Johnson*, 400 F.3d 187, 194 (4th Cir. 2005).

### III. ANALYSIS

Defendant's sole argument in support of his motion to suppress is that, having invoked his rights to remain silent and to counsel at the outset of the flight, any statements he subsequently made without the presence of counsel were obtained in violation of the Fifth Amendment. (Def.'s Mot. Dismiss at 3.)

Recognizing that the "'rigid' prophylactic rule" of *Edwards* applies only where an accused "unambiguously request[s] counsel," *Davis v. United States* 512 U.S. 452, 459 (1994), the Court begins its analysis by asking whether or not Defendant actually invoked his right to counsel. Here, Defendant stated that he needed some professional help and that he thought he wanted a lawyer. It is unlikely that these statements were sufficiently unambiguous to merit application of *Edwards*' protections. Indeed, the Supreme Court has counseled that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel . . . precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459 (1994) (holding that accused's remark, "Maybe I should talk to a lawyer," did not invoke right to counsel and did not require cessation of questioning). Nonetheless, because the agents present treated Defendant's statement about needing professional help as an invocation of the right to counsel, the Court need not reach this question.

Instead, the primary inquiry is whether Defendant initiated the conversation in which he made the statements now in question. The facts of this case are similar to those considered by the Supreme Court in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983). In *Bradshaw*, the investigating officer ceased questioning the defendant after the defendant invoked his right to counsel. Sometime later, the defendant asked the officer, "What is going to happen to me now?" to which the officer responded that any further conversation had to be of the defendant's own

free will. *Id.* at 1042. The defendant indicated that he understood this, but that he nonetheless wished to speak. *Id.* Concluding that the defendant's question as to what would happen to him was an initiation of further conversation with law enforcement, a plurality of the Supreme Court held that the defendant's subsequent statements were admissible. *Id.* at 1045.

Defendant relies on the Supreme Court's holding in *McNeil v. Wisconsin* that any statement made after an accused requests counsel, without a break in custody, and before the accused is provided access to counsel is presumed involuntary. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). However, this presumption applies only where law enforcement officers subsequently initiate an encounter in the absence of counsel, and is inapposite where the defendant himself initiates the conversation. *Id.* The uncontradicted testimony presented at the Suppression Hearing, held before this Court on January 19, 2012, indicated that following Defendant's initial invocation of the right to counsel, Defendant repeatedly attempted to engage the FBI agents in conversation during the flight from Somalia to the United States. Hr'g Tr. 35. According to this testimony, it was only after Defendant's persistent attempts to discuss his case, and only after he expressly stated that he was willing to talk without an attorney present, that the agents began to question Defendant about the case. Hr'g Tr. 35-37. Thus, based on the uncontroverted evidence presented to the Court, it was Defendant, and not the government agents involved, who initiated the conversations which produced the statements which Defendant now seeks to suppress.

Having concluded that Defendant initiated these conversations, the sole question which remains to be answered is whether Defendant's statements were made pursuant to a knowing, intelligent, and voluntary waiver of his *Miranda* rights. *Bradshaw*, 462 U.S. at 1045 ("even if a conversation taking place after the accused 'has expressed his desire to deal with the police only

through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains on the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation"); *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (waiver of *Miranda* rights must be voluntary, knowing, and intelligent).

To determine whether a confession was voluntary, we look to the totality of circumstances. *Withrow v. Williams*, 507 U.S. 680, 693 (1993). In this case, there is no evidence that the FBI agents who took Defendant's statement exerted improper coercion. On the contrary, the testimony presented indicates that Defendant was well fed, well rested, and in receipt of medical care at the time the questioning occurred, and that the agents actually removed his handcuffs prior to initiating questioning. Hr'g Tr. 34, 48. Moreover, it is undisputed that before Defendant began to speak, the agents provided him with standard *Miranda* warnings and that Defendant had already had an opportunity to review these warnings on at least three prior occasions. Hr'g Tr. 37-38, 6-7, 10-11. The evidence before the Court showed that Defendant had previously served as a translator, is clearly conversant in the English language, and had no trouble understanding the content of the *Miranda* warnings. Thus, because after receiving *Miranda* warnings a fourth time, Defendant nonetheless executed a written waiver and agreed to speak, the Court concludes that Defendant's waiver of his rights was knowing, voluntary, and intelligent. *See Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (waiver of *Miranda* rights is presumed voluntary unless circumstances indicate otherwise).

For the reasons stated herein, Defendant's motion to suppress is hereby **DENIED**.

**It is so ORDERED.**

Norfolk, Virginia
January 23, 2012

/s/
Robert G. Doumar
Senior United States District Judge